IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**IN THE MATTER OF THE
EXTRADITION OF ANA NETZKY**

Case No. 3:20-mj-00220

**ORDER DENYING REQUEST
FOR EXTRADITION**

---

**BECKERMAN, U.S. Magistrate Judge.**

    The United States, on behalf of the Republic of Poland (the "Government"), seeks the extradition of Ana Netzky ("Netzky," formerly Agnieszka Trzaskowska), a legal permanent resident of the United States, to face charges in Poland for an alleged offense that occurred in or about 2000. After carefully reviewing and considering the evidence the Government submitted, as well as the oral and written arguments of counsel, the Court finds that the Government has not met its burden of establishing probable cause to believe that Netzky committed the alleged offense. Accordingly, and for the reasons discussed below, the Court denies the Government's extradition request.

## BACKGROUND

    In February 2008, the Regional Court in Katowice, Poland issued a warrant for Netzky's arrest after charging her with one count of forcible extortion while acting in an organized

criminal group in violation of Article 282 of the Criminal Code of Poland. (Compl. ¶ 4, ECF No. 10.) The Government alleges that in or about 1999, an individual named E.J. ("E.J.") loaned money from Przedsiebiorstwo Uslugowo-Produkcyjne ("Roller"), a company based in Warsaw, Poland, operated by Marek Lesiak ("Lesiak") and Netzky. (Compl. ¶ 6(b).) Between 2000 and 2001, Lesiak and Netzky allegedly engaged an organized criminal group to threaten E.J. when she failed to repay the loan. (*Id.*)

The United States applied for and received an arrest warrant for Netzky in August 2020, and arrested Netzky on or about September 8, 2020. (ECF Nos. 1-2, 6.) The Court presided over Netzky's first appearance on the complaint on September 9, 2020, and released Netzky from custody on September 15, 2020, over the Government's objection. (ECF Nos. 6-7, 13.) The Court found that Netzky had "overcome the presumption against release in extradition proceedings, and met her burden of demonstrating special circumstances that warrant her release." (ECF No. 13.) Specifically, the Court found that the "cumulative effect of the following special circumstances warrant her release: (1) the nearly 20-year delay in prosecution and extradition, and no allegations of criminal conduct since May 2000 in Poland; (2) Ms. Netzky is a legal permanent resident and has strong ties to Oregon and to the United States; (3) Ms. Netzky's familial caretaking responsibilities, including government-certified care of a disabled spouse and primary care of a young daughter, rendered more critical in light of Covid-19; and (4) no compelling evidence that Ms. Netzky has attempted to evade prosecution (which was not initiated until two years after she left Poland)." (*Id.*)

The Court held an extradition hearing on April 14, 2022, and took the matter under advisement on that date. (ECF No. 51.)

///

PAGE 2 – ORDER DENYING REQUEST FOR EXTRADITION

## THE GOVERNMENT'S EVIDENCE

In support of its extradition request, the Government submitted a Polish prosecutor's summary of the testimony of six individuals with knowledge of Netzky's alleged offense:

1.    E.J., the victim;

2.    M.S., the victim's ex-husband;

3.    Lesiak, Netzky's convicted business partner at Roller;

4.    Dariusz Petryka ("Petryka"), a crown witness;

5.    Piotr Kapuscinski ("Kapuscinski"), a crown witness and Lesiak's convicted co-conspirator; and

6.    Martin Wieczorek, Lesiak's convicted co-conspirator.

(Memo Law Supp. Extradition at 10-13, ECF No. 25.)

The Government summarized the testimony of these six witnesses as follows:

1.    [E.J.], the victim, operated a grocery wholesaler in Bielsko-Biala in the 1990s. She was in arrears on a bank loan toward the end of the decade, however, and thus, according to her testimony, she borrowed "30,000 or 40,000 PLN" from Roller, which was represented by Netzky and a partner, Marek Lesiak. (E.J. positively identified Netzky by photograph on October 22, 2007.) As to the terms of the loan, E.J. agreed to repay Roller in installments of 15,000 PLN per month. That agreement didn't last long. ***Netzky and Lesiak informed E.J. after just two monthly installments that the interest due exceeded the principal of her loan and began a campaign of harassment and threats to compel the payment of more money***.

In the fall of 1999 or spring of 2000, Piotr Kapuscinski and Albert Ostrach came to E.J.'s boarding house and "threatened destruction of the premises," leaving only after she gave them 5,000 PLN. Kapuscinski and Ostrach gave E.J. a business card—which E.J. in turn handed over to the Polish authorities—for a fictitious entity named "Kaminski Brothers Investment-Capital Group."

In the spring of 2000, Lesiak and Jerzy Dziadosz visited E.J. and extracted her commitment to repay 145,000 PLN. E.J., however, defaulted on this usurious agreement. Consequently, ***Netzky and Lesiak proceeded to warn E.J. that the money she had purportedly borrowed had come from a criminal organization that would resort to having "mob people . . . take care of her family."*** Sometime

PAGE 3 – ORDER DENYING REQUEST FOR EXTRADITION

thereafter, Albert Ostrach (along with another man) again accosted E.J.. Swearing and brandishing a gun at her, Ostrach threatened to shoot and kill E.J. and her family if she did not pay up.

In the face of these threats, E.J. testified, she paid various persons a total of 100,000 PLN and personally gave Ostrach another 100,000 PLN in February 2001. (Ex. 1 at 54-55.)

2.  [M.S.], E.J.'s ex-husband, testified that three men visited their residence in the spring of 2000 as part of an effort to extort money from her and that two men repeatedly visited the premises, taking money from his wife "under the influence of threats." He personally received threats and "answered calls with threats addressed at his ex-wife." (Ex. 1 at 55-56.)

3.  DARIUSZ PETRYKA, was a criminal confederate of Jacek Maslowski (who has already been convicted of extortion in relation to the crime at issue here). *Petryka identified Netzky by photograph and testified that she ran the Roller moneylending firm. He had personally witnessed Netzky commissioning gang members to collect various debts, though apparently not E.J.'s.* He testified about his friend Maslowski's account, however, of the "actions taken against" E.J. by Piotr Kapuscinski, Marcin Wiczorek, and Albert Ostrach in their efforts to collect money from E.J., which they then kicked up to the head of their gang, Tadeusz Wojak. (Ex. 1 at 56.)

4.  PIOTR KAPUSCINSKI was a member of the gang that extorted funds from E.J.. *Kapuscinski testified in a hearing in March 2012 that Netzky and Lesiak owned the Roller firm and that he had worked with both repeatedly. Netzky "was the leading figure in commissioning him and his associates with extortion."*

    He further testified that he and Albert Ostrach, under the direction of Tadeusz Wojak and *at the behest of Netzky and Lesiak*, posed as representatives of "Kaminski Brothers Investment-Capital Group" and under that pretense extorted at least 130,000 PLN from E.J. using "physical force and threatened . . . use of firearms." (Ex. 1 at 56-57.) He was convicted of the offense with which Netzky is charged and sentenced to two to three years' imprisonment.

5.  MAREK LESIAK was Netzky's business partner in the Roller firm. *During the investigation into his own role in the matter and in his own prosecution, he acknowledged lending 90,000 PLN to E.J. and, at Netkzy's direction, visiting E.J. with a man named Jerzy Dziadosz in April 2000*. Lesiak admitted that he accepted an "assignment of receivables in the amount of 145,000 PLN" and a commitment of payment by May 15, 2000, during that meeting. *He also admitted repeatedly calling E.J. about the loan at Netzky's direction, but he denied that Netzky threatened E.J.* (Ex. 1 at 57-58.) He was nevertheless convicted of the offense with which Netzky is charged and sentenced to two to three years' imprisonment.

> 6.    Marcin Wieczorek pleaded guilty to extorting money from E.J. in the same criminal act with which Netzky is charged. He admitted to driving Piotr Kapuscinski and Albert Ostrach to E.J.'s residence in Bielsko-Biala at Wojak's direction. During that encounter, E.J. withdrew over 100,000 PLN and handed it to Kapuscinski (who later gave Wieczorek 2,000 PLN). Wieczorek believed this event occurred in 1999 and that Kapuscinski and Ostrach had made previous visits to E.J. to collect mon[ie]s from her. (Ex. 1 at 58.)

(*Id.*) (emphasis added to highlight allegations implicating Netzky).

After the Government filed its memorandum in support of extradition, Netzky filed a motion to compel the Government to produce discovery (ECF No. 29), as well as a motion for letters rogatory (ECF No. 30). Netzky asked the Court to order the Government to produce witness statements, deposition transcripts, witness testimony and transcripts, and trial evidence on which the above witness summaries are based, or to issue letters rogatory to Poland to obtain the requested documents and witness contact information. Netzky noted that the Polish prosecutor's witness summaries refer to both Lesiak and Netzky acting in tandem, and it is unclear from the prosecutor's summaries if any witness testified that Netzky was involved with threatening the victim or engaging others to threaten the victim.

At a hearing on Netzky's discovery motions, the Court informed the Government that it agreed with Netzky that the Polish prosecutor's summary of the evidence was ambiguous as to Netzky's role in the charged offense, and that the Court believed the discovery Netzky requested was relevant and would be helpful to the Court's probable cause determination:

> [Court]: . . . I do find that some of the discovery [Netzky] requests is relevant to the Court's determination of whether there is competent evidence to support a probable cause finding here. And I base that in large part on the fact that in the Government's memorandum in support of extradition, the Government includes at Exhibit 1 the Polish prosecutor's summary of evidence in support of a probable cause finding beginning at page 49 of Exhibit 1. And specifically the prosecutor summarizes what the prosecutor views as the relevant witness testimony against Ms. Netzky.

PAGE 5 – ORDER DENYING REQUEST FOR EXTRADITION

And the problem that I find with the summaries, which, . . . as highlighted by [Netzky], is that in several of the summaries, there are statements that refer to both Ms. Netzky and her partner, Marek Lesiak, as performing some sort of an illegal act together. For example, in [E.J.'s] summary, . . . she never singularly identifies Netzky as saying or doing anything on her own accord; she always refers to Ms. Netzky and Mr. Lesiak.

And so based just on those summaries, which is really, at least in the English translated version of Exhibit 1 that I'm able to read, it appears that that's the primary evidence that the Government is submitting in support of the court's probable cause finding. And based on my reading of the summaries, it is -- it is quite difficult, if not impossible, to determine what actions Ms. Netzky took independent of her alleged co-conspirators.

And so as I read through those witness summaries, specifically the prosecutor lists them out as 1 through 8 beginning at . . . page 54 of Exhibit 1, it seems that the actual witness statements and other documentary evidence, although there's not much, it's mostly witness statements that are listed at 1 through 8 [that] would be relevant and, frankly, helpful to the Court's probable cause determination here.

And to be clear, I am not questioning the reliability of the prosecutor's summary . . . for any reason. I am just finding that my reading of it is that it is ambiguous or at least unclear as to Ms. Netzky's actions standing alone because of the way it references both her and her partner as acting together.

(Nov. 30, 2021, Tr. at 4-6, ECF No. 39; *see also* Tr. at 30, "[M]y concern [i]s more with either the ambiguity of the translation or perhaps just of the summary itself that actions and statements were attributed to both of them. And in some respects it seemed that they were statements that they could not both have made simultaneously, for example, . . . when they're referring to both of them, are they really referring to both of them making that statement or that threat or taking that action, or are they being grouped together either because of the translation or because of just the way that they refer to things[.]").

The Government objected to responding to Netzky's discovery requests, based on the timing of the requests and what the Government believed was a lack of authority for the Court to order the Government to request any additional materials from Poland. (Tr. at 24-25.) The Government took the position that this is a "garden variety extradition proceeding" and is a

PAGE 6 – ORDER DENYING REQUEST FOR EXTRADITION

"relative[ly] superficial proceeding[] to assess the existence of probable cause based on the evidence that is adduced voluntarily by the foreign government requesting the production of the fugitive." (Tr. at 25.) The Government argued that its refusal to obtain the requested discovery materials was based on "the Justice Department's more systemic concerns with attempting to respond to every magistrate judge's curiosity about certain ambiguities or certain things that don't seem as strong as they might otherwise be in every case going back to the requesting country to try and respond to those, and that that would just result in a systemic disruption to what should be fairly mundane ministerial assessments of probable cause based on documents submitted by the requesting country." (Tr. at 31-32, further explaining that the Department of Justice had declined to request additional information from the Polish authorities, and the Government is "going to stand on what the Polish authorities have provided").

The Court denied Netzky's discovery motions, but did so "with leave to renew if the government seeks to rely on additional documentary evidence at the extradition hearing not already included in Government Exhibit 1, attached to its Memorandum of Law in Support of Extradition." (ECF No. 40.) The Court acknowledged in its denial that it had "shared its concern that the government's documentary evidence to support probable cause was lacking, but the government opposed allowing Netzky to conduct any form of discovery to assist the Court in its probable cause determination." (*Id.*)

Thereafter, the Government filed a supplemental memorandum in support of extradition. (ECF No. 42 ("Supp. Memo").) The Government explained that in light of the Court's concerns about the lack of probable cause in the Polish prosecutor's witness summaries, the Government had requested from Poland additional excerpts of the witness statements. (Supp. Memo at 2.) Specifically, the Government sought witness statements about Netzky's own interactions with

the victim and her personal role in the offense. (*Id.*) In response to that request, Poland produced additional excerpts of testimony and statements on February 2, 2022, which the Government attached to its supplemental memorandum. (*Id.*, Ex. 1.)

The Government argued that the following supplemental excerpts of witness testimony confirm Netzky's role in the extortion:

1. <u>Dariusz Pietryka</u>: During his interrogation on November 7, 2007, Pietryka described how he had worked with both Marek Lesiak and Netzky to resolve their disputes with third parties after 2001. ***Pietryka averred that "[Netzky] . . . made important decisions in financial matters because Marek Lesiak abused alcohol."*** (Ex. 2 at 11 ¶ 2.)

2. <u>The Victim</u>: The victim testified or made statements on numerous occasions during the Polish proceedings. On October 8, 2007, she noted that, after several visits to the Roller headquarters, ***she had "concluded that [Netzky] is an equal partner with Marek Lesiak."*** On the same date, the victim repeatedly attested that Lesiak and [Netzky] both acted in the extortion scheme: ***"I learned from Marek Lesiak and [Netzky] that my debt ha[d] grown to an amount that exceeds the value of the loan . . . . From that day on I was threatened with the mafia by Marek Lesiak and [Netzky], who explained to me that the money lent to me was not their property and came from their good deal with the mafia. They didn't elaborate on the wording . . . . Marek and [Netzky] threatened me that if I didn't return the money, the people they were working with would hurt my family and even gave me details about my family.***" (*Id.* ¶ 3 (emphases added).) The victim made substantially the same representations on October 31, 2007. (*Id.* ¶ 4.) ***On December 17, 2007, the victim described how "Lesiak and [Netzky]" recruited her to participate in an apparent fraud scheme by way of "working off" the money they demanded, and they both "called [her] about these loans."*** (*Id.* ¶ 5.) ***She elaborated that Netzky[] herself "reminded [the victim] several times by phone about the amount of money requested, the place where the money was to be transferred, the date and time . . . ."*** (*Id.* at 12 ¶ 5.) The victim's testimony elsewhere underscores her ability to distinguish occasions when Lesiak and Netzky[] acted together from occasions when they acted independently. For instance, she described Lesiak alone as "smil[ing]" and warning her "not even to try to think about the fact that [she] might not be able to return the money because there were ways to collect it." (*Id.* ¶ 8.)

3. <u>Marek Lesiak</u>: During an interrogation on November 22, 2007, Lesiak described ***Netzky[] as "[t]he owner" of Roller and claimed that she***

> *would have ensured that the victim signed for the contested loan, "because [Netzky] took care of these matters.*" (*Id.* ¶ 7.)

4. <u>Piotr Kapuscinski</u>: Kapuscinski testified in open court on March 30, 2012, about his interactions with Lesiak and Netzky[] as well as his (Kapuscinski's) own role in "direct[ing] the enforcement against" the victim. Despite his repeated one-on-one interactions with Lesiak, *Kapuscinski states unambiguously that he "was commissioned to enforce the money from [the victim] by Lesiak and [Netzky]" and that "Lesiak and [Netzky] knew very well that they were ordering enforcement against the victim . . . ."* (*Id.* at 13 ¶ 13.)

(Supp. Memo at 3-5, Ex. 2.)

Following the April 14, 2022 extradition hearing, Netzky filed a second motion to compel discovery on May 10, 2022, requesting all communications between the United States and Poland (as well as internal communications) regarding Poland's extradition request in light of the Government's representation at the extradition hearing that the United States' six-year delay in processing Poland's extradition request was the result of Poland's lack of responsiveness to the United States' inquiries. (ECF No. 52.) The United States opposed the motion. (ECF No. 54.)

## DISCUSSION

## I.    LEGAL STANDARDS

Extradition is a diplomatic process governed by the federal extradition statute, 18 U.S.C. § 3181 *et seq.*, and by the relevant treaty—in this case, the Extradition Treaty between the United States of America and the Republic of Poland (the "Treaty"). (*See* Decl. of Tom Heinemann, Memo Law Supp. Extradition, Ex. 1 at 1-2, ECF No. 25-1, attaching Treaty and attesting that the Treaty is "in full force and effect").

Section 3184 governs international extradition procedures in the United States:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may,

upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that [s]he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, [s]he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . [s]he shall certify the same, together with a copy of all the testimony taken before h[er], to the Secretary of State[.]

18 U.S.C. § 3184; *see also Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997)

("Extradition is a matter of foreign policy entirely within the discretion of the executive branch,

except to the extent that the statute interposes a judicial function." (citing *In re Metzger*, 46 U.S.

(5 How.) 176, 188 (1847))).

Five requirements must be satisfied for the Court to certify extradition to the

requesting country:

(1)     The Court must have subject matter jurisdiction to conduct the extradition proceeding;

(2)     the Court must have personal jurisdiction over the extraditee;

(3)     the applicable extradition treaty remains in force and effect;

(4)     the requesting government is seeking to extradite the extraditee for offenses covered by the extradition treaty; and

(5)     there is competent evidence that the extraditee committed the offenses for which the requesting government seeks extradition.

*In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1304 (D. Or. 2013). "If the court concludes

that each of the above elements are met, it has no discretion and must certify extradition to the

Secretary of State." *Id.* (citing 18 U.S.C. § 3190 and *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th

Cir. 2008)).

The Supreme Court has instructed that extradition treaties "should be liberally construed

so as to effect the apparent intention of the parties to secure equality and reciprocity between

them." *Factor v. Laubenheimer*, 290 U.S. 276, 294 (1933). Nevertheless, courts have recognized

that extradition judges "must . . . exercise their independent judgment in a case or controversy to

determine the propriety of an individual's extradition" and "[t]he executive may not foreclose the

courts from exercising their responsibility to protect the integrity of the judicial process." *Ahmad*

*v. Wigen*, 726 F. Supp. 389, 412 (E.D.N.Y. 1989) ("A court must ensure that it is not used for

purposes which do not comport with our Constitution or principles of fundamental fairness.").

Although the role of an extradition judge "is indeed a limited one, this is not to say that a judge

in an extradition proceeding is expected to wield a rubber stamp." *Santos v. Thomas*, 830 F.3d

987, 1006 (9th Cir. 2016) (simplified).

## II.    ANALYSIS

Netzky opposes extradition on two primary grounds.[1] First, Netzky argues that the

Government has not satisfied the dual criminality or probable cause requirements. (Netzky

Opp'n to Extradition ("Netzky Opp'n") at 27-35, ECF No. 45.) Second, Netzky argues that the

prejudicial effect of the nearly twenty-year delay in extraditing her for the alleged crime violates

her constitutional right to due process and a fair trial. (*Id.* at 35-38.)

### A.    Dual Criminality

#### 1.    Legal Standards

For an offense to be covered by an extradition treaty, the Court must consider whether the

offense (1) is listed as an extraditable crime in the treaty; (2) whether the alleged conduct is

criminalized in both countries; and (3) whether the offenses in both countries are "substantially

analogous." *United States v. Knotek*, 925 F.3d 1118, 1128-29 (9th Cir. 2019). In deciding

---

[1] Netzky does not contest that this Court has jurisdiction to conduct these extradition
proceedings, that the Court has jurisdiction over her, or that the Treaty is in full force and effect.
The Court agrees and independently so finds.

whether the offenses are "substantially analogous," the Court considers whether "the essential character of the transaction is the same, and made criminal by both statutes." *Id.* at 1131 (simplified). In other words, the charged offense must be a crime in both Poland and the United States. *See Factor*, 290 U.S. at 298-300.

The Treaty defines an extraditable offense as one "punishable under the law of both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." (Treaty, Annex Art. 2, ¶ 1, at 10; *see also* Annex Art. 2, ¶ 2, providing that the conspiracy to commit a felony is also an extraditable offense). Poland charged Netzky with violating Article 282 of its Criminal Code, which states:

> Any person who for the purposes of obtaining financial benefits, makes another person administer his/her own or [a] third party's property or cease his/her business conduction by way of violence, threat to life or health, or threat against property, will be liable to imprisonment of one year to [ten] years.

(Supp. Info., Ex. P at 5, ECF 45-16.)

The Government submits that the charged Polish crime is substantially analogous to the crime of mailing threatening communications because the "essential character of the transaction is the same[.]" (Memo Law Supp. Extradition at 8.) Under the referenced statute, it is unlawful in the United States to "deposit[] or cause[] to be delivered . . . any communication containing any . . . threat to injure the person of the addressee or of another" "with intent to extort from any person any money or other thing of value[.]" 18 U.S.C. § 876(b). The Government argues that the "essential character" of both the charged crime and the analogous crime under United States law is the "intent to extort from any person any money or other thing of value[.]" (Memo Law Supp. Extradition at 8.) Netzky argues that the Government has not satisfied the dual criminality requirement because Netzky's alleged *conduct* cannot qualify as either extortion or racketeering under United States law. (Netzky Opp'n at 33.)

PAGE 12 – ORDER DENYING REQUEST FOR EXTRADITION

2.     **Analysis**

The Court agrees with the Government that the essential character of the Polish crime of extortion, as alleged, is substantially analogous to the corresponding crime of sending threatening communications with the intent to extort under United States law, and therefore the charged crime falls within the terms of the Treaty. *See Mathison*, 974 F. Supp. 2d at 1313 (finding the dual criminality requirement satisfied, and rejecting arguments that different means of carrying out fraud defeated dual criminality because both the U.S. and Mexico's statutes "turn[ed] on the accused person having obtained money or an item of value from another by using false or fraudulent representations or pretenses").

Although the Court concludes that the Treaty covers the extortion offense Poland charged here, the Government has not produced sufficient evidence to establish probable cause that Netzky committed the offense.

**B.     Competent Evidence to Support Probable Cause**

Netzky challenges extradition on the ground that Poland has not provided the United States with competent legal evidence to support a finding of probable cause that she committed the charged offense. The Court agrees.

1.     **Legal Standards**

a.     **Probable Cause**

"The court's task in [extradition] proceedings is to determine: (1) whether the fugitive is accused of an extraditable crime and (2) whether there is probable cause to believe the fugitive committed the crime he is charged with." *In re Extradition of Ameen*, No. 2:18-mj-152-EFB, 2021 WL 1564520, at *9 (E.D. Cal. Apr. 21, 2021) (citing *Santos*, 830 F.3d at 991). "[T]he judicial officer conducts a hearing to determine whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' . . . in other words, whether

there is probable cause." *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) (quoting 18 U.S.C. § 3184).

"[T]he judicial branch's role in extradition proceedings is limited, but important." *In re Mazur*, No. 06 M 295, 2007 WL 2122401, at *17 (N.D. Ill. July 20, 2007). "The Court's job here is not to determine guilt or innocence, or to consider what fate might await [the extraditee] in the Requesting State; the Court's job is to consider and decide just two issues: first, whether the crime charged is extraditable under the relevant Treaty, and, second, whether there is probable cause to sustain the charge." *Id.* (citing 18 U.S.C. § 3184; *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1984); and *Prasoprat v. Benov*, 421 F.3d 1009, 1012, 1014 (9th Cir. 2005)).

"The government bears the burden of establishing extraditability, so the government must show, among other things, that there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense." *Matter of Extradition of Santos*, 228 F. Supp. 3d 1034, 1036 (C.D. Cal. 2017) (citing 18 U.S.C. §§ 3184, 3190; *Manta*, 518 F.3d at 1140; and *In re Extradition of Santos*, 795 F. Supp. 2d 966, 969-70 (C.D. Cal. 2011)). "Probable cause has generally been defined as sufficient evidence to convince a person 'of prudence and caution' that a crime was committed and that the accused committed it." *Ameen*, 2021 WL 1564520, at *13 (citing *Carroll v. United States*, 267 U.S. 132, 160-61 (1925) and *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). "The judge in an extradition proceeding applies a standard similar to that of a preliminary hearing, determining whether the evidence justifies holding the accused for trial, not whether the evidence may justify a conviction." *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1121 (E.D. Cal. Nov. 12, 2003) (citing *In re Extradition of Powell*, 4 F. Supp. 2d 945 (S.D. Cal. 1998)); *see also Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913) (comparing an extradition hearing to a grand jury investigation); *Mathison*,

974 F. Supp. 2d at 1313 (noting that probable cause is established "when officers have knowledge or reasonable trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested" (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007))).

"The 'totality of the circumstances' principle articulated in *Gates* has been applied in extradition hearings." *Ameen*, 2021 WL 1564520, at *13 (citing *In re Extradition of Howard*, No. 2:15-mj-00627-NJK, 2017 WL 2870088, at *7 (D. Nev. July 3, 2017) and *In re Camelo-Grillo*, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *6 (C.D. Cal. Jul. 10, 2017)); *see also Gates*, 462 U.S. at 238 (instructing courts to apply a "totality of the circumstances analysis" and "make a practical, commonsense decision whether, given all the circumstances . . . , there is a fair probability" that the defendant committed the crime).

"It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate [judge's] probable cause hearing." *Santos*, 830 F.3d at 991 (quoting *Eain*, 641 F.2d at 508). "Rather, '[t]he function of the committing magistrate [judge] is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.'" *Id.* at 991-92 (quoting *Collins v. Loisel*, 259 U.S. 309, 316 (1922)). "Thus, courts have emphasized that '[t]he person charged is not to be tried in this country for crimes he is alleged to have committed in the requesting country" because "[t]hat is the task of the . . . courts of the other country." *Id.* at 992 (quoting *Eain*, 641 F.2d at 508). "If the judicial officer determines that there is probable cause, [s]he is required to certify the individual as extraditable to the Secretary of State." *Vo*, 447 F.3d at 1237 (quoting *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003)) (simplified).

b.      **Competent Evidence**

"International extradition proceedings are not governed by the Federal Rules of Evidence[] [or] the hearsay prohibitions[.]" *Strunk*, 293 F. Supp. 2d at 1122 (citing, *inter alia*, FED. R. EVID. 1101(d)(3); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986); and 18 U.S.C. § 3172(2)); *see also In re Mazur*, No. 06 M 295, 2007 WL 839982, at *5 (N.D. Ill. Mar. 15, 2007) ("To be sure, an extradition proceeding is a strange bird: it is not a criminal proceeding, though it involves criminal conduct; and, although it is a federal court hearing, neither the federal rules of criminal procedure, nor the federal rules of evidence applies."); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings.") (citation omitted).

At the extradition hearing, an extraditee may present "explanatory" evidence but may not offer "contradictory" evidence: "[E]xplanatory evidence is evidence that explains away or completely obliterates probable cause, whereas contradictory evidence is that which merely controverts the existence of probable cause, or raises a defense." *Santos*, 830 F.3d at 992 (simplified); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("[The extraditee] is not permitted to introduce evidence on the issue of guilt or innocence but can only offer evidence that tends to explain the government's case of probable cause."). Thus, an extraditee may not present evidence that contradicts the Government's evidence, but may present evidence that "'explain[s] ambiguities or doubtful elements' in the government's case." *Santos*, 830 F.3d at 993 (citation omitted); *Mazur*, 2007 WL 2122401, at *19 (explaining that an extraditee's "right to present and challenge evidence at the hearing is similarly limited" and "[t]he [extradite] can offer evidence that 'explains' the requesting country's proof, hut he may not offer evidence that 'contradicts' that proof"); *but see Strunk*, 293 F. Supp. 2d at 1122 ("The distinction between

evidence which 'explains' and evidence which 'contradicts' seems metaphysical. On one side of the line, the court cannot weigh conflicting evidence to make factual determinations. On the other side, an accused nevertheless is permitted to produce evidence in an attempt to 'negate' or 'obliterate' probable cause." (citing, *inter alia*, *Hooker*, 573 F.2d at 1369)).

"Although an extradition court is not authorized to conduct a mini-trial, it still must determine the competency of evidence—a determination which involves assessing the credibility of the government's evidence." *In re Extradition of Santos*, 228 F. Supp. 3d at 1054-55 (citations omitted); *see also Quinn*, 783 F.2d at 815 ("The credibility of witnesses and the weight to be afforded their testimony is solely within the province of the extradition magistrate [judge]."); *In re Extradition of Singh*, 170 F. Supp. 2d 982, 1023 (E.D. Cal. 2001) ("[T]he extradition judge makes credibility determinations as to the competence of the evidence supporting probable cause.").

"[T]he evidence offered in support of extradition must be 'competent and adequate.'" *In re Extradition of Paberalius*, No. 10 M 275, 2011 WL 2144065, at *13 (N.D. Ill. May 31, 2011) (quoting *Bingham v. Bradley*, 241 U.S. 511, 517 (1916)). "Accordingly, when 'presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted that there are insufficient indicia of reliability or credibility to establish probable cause.'" *Id.* (citing *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006)). "Similarly, when an extradition request consists of 'mere conclusory allegations unsupported by substantive evidence, extradition will be denied.'" *Id.* (citing *Rodriguez Ortiz*, 444 F. Supp. 2d at 884).

### 2.    Analysis

The Government argues that it has demonstrated probable cause to believe that Netzky committed the charged crime based on the Polish prosecutor's original summaries of the testimony of six witnesses (Memo Law Supp. Extradition at 3, 10-13), as well as the additional

excerpts of selected witness testimony (Supp. Memo at 2-5). Having carefully reviewed all of

Poland's evidence implicating Netzky, the Court finds that the Government has failed to provide

competent legal evidence to meet its burden of demonstrating probable cause.

### a.    Netzky's Evidence

Netzky has submitted a large volume of evidence for the Court's consideration, but it is

not necessary for the Court to weigh that evidence here in light of the absence of probable cause

in the Government's evidence.[2] *See Strunk*, 293 F. Supp. 2d at 1133-34 ("It is not critical at this

point to weigh [the extraditee's] evidence since that submitted by the [the requesting country]

when viewed as a whole does not impart a reasonable belief in [the extraditee's] complicity.").

### b.    The Government's Evidence

#### 1)    E.J.'s Testimony (The Victim)

The Government largely relies on excerpts from the victim's (E.J.) testimony, but each of

the excerpts the Government cites either implicates Netzky only in non-criminal acts she

performed as Roller's administrative assistant or is conclusory and does not articulate any

specific act that Netzky performed.

In its original summary of E.J.'s testimony, E.J. mentions only Netzky and Lesiak in

tandem and never attributes any specific act to Netzky:

> ***Netzky and Lesiak*** informed E.J. after just two monthly installments that the
> interest due exceeded the principal of her loan and began a campaign of
> harassment and threats to compel the payment of more money.

---

[2] For example, Netzky submitted evidence of Lesiak's physical, sexual, emotional, psychological, and financial abuse of Netzky for many years, arguing that it is admissible because it "explain[s] the context in which [Netzky's] actions occurred." (Netzky Opp'n at 23.) Specifically, Netzky argues that "Lesiak's long history of manipulating and controlling Netzky through violence and abuse offers an explanation for witnesses concluding she must have been involved in the crime, when in reality she never actively or independently participated in any organized criminal scheme to extort [E.J.]" (Netzky Opp'n at 23-24.) The Court finds that Netzky's evidence is competent, but the Court need not consider it here in the absence of probable cause.

> ***Netzky and Lesiak*** proceeded to warn E.J. that the money she had purportedly borrowed had come from a criminal organization that would resort to having "mob people . . . take care of her family."

(Memo Law Supp. Extradition at 10-11.) The victim's testimony, as summarized by the Polish prosecutor, is too conclusory to determine which statements Netzky made, as opposed to Lesiak, and it is also too conclusory to determine that both Netzky and Lesiak made the same statements. *See United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013) (conclusory statements are "afford[ed] little if any weight in the probable cause analysis"); *In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1239 (S.D. Cal. 2002) ("Even when an affidavit is provided, the showing must identify the facts and go beyond conclusory characterizations."); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999) (rejecting extradition request where, *inter alia*, the affidavit in support contained "a variety of conclusory and speculative statements") (simplified); *In re Lehming*, 951 F. Supp. 505, 517 (D. Del. 1996) (finding that "[c]onclusory statements do not satisfy the probable cause standard" and finding no probable cause where the report relied upon by the government "does not provide sufficient factual detail which allows this Court to conclude that probable cause exists"); *see also In re Extradition of Ben-Dak*, No. 06 Mag. 1540(GWG), 2008 WL 1307816, at *14 (S.D.N.Y. Apr. 11, 2008) ("In reviewing an extradition request, 'a court must conduct an independent assessment of the evidence and closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause.'" (quoting *United States v. Pena-Bencosme*, No. 05-M-1518 (SMG), 2006 WL 3290361, at *2 (E.D.N.Y. Nov. 13, 2006))).

Similarly, in its second attempt to support probable cause, the Government supplied additional excerpts of E.J.'s testimony which also attributes bad acts to Netzky and Lesiak as a pair:

PAGE 19 – ORDER DENYING REQUEST FOR EXTRADITION

On October 8, 2007, she noted that, after several visits to the Roller headquarters, she had "concluded that [Netzky] is an equal partner with Marek Lesiak."

"I learned from **Marek Lesiak and [Netzky]** that my debt ha[d] grown to an amount that exceeds the value of the loan . . . . From that day on I was threatened with the mafia by **Marek Lesiak and [Netzky]**, who explained to me that the money lent to me was not their property and came from their good deal with the mafia. They didn't elaborate on the wording . . . . **Marek and [Netzky]** threatened me that if I didn't return the money, the people they were working with would hurt my family and even gave me details about my family."

On December 17, 2007, the victim described how **"Lesiak and [Netzky]"** recruited her to participate in an apparent fraud scheme by way of "working off" the money they demanded, and they both "called [her] about these loans." (*Id.* ¶ 5.) She elaborated that Netzky[] herself "reminded [the victim] several times by phone about the amount of money requested, the place where the money was to be transferred, the date and time . . . ." (*Id.* at 12 ¶ 5.)

(Supp. Memo at 3-4.) Notably, even after the Court shared its concerns that E.J. had not attributed any specific actions to Netzky as opposed to "Lesiak and Netzky," Poland could not produce any non-conclusory testimony from E.J. that Netzky ever threatened E.J., engaged the criminal group to threaten E.J., or committed any other unlawful acts. Poland provided only select excerpts of testimony, rather than provide transcripts of testimony, but even in its own hand-picked excerpts of E.J.'s testimony she does not attribute any bad acts to Netzky. *See In re Extradition of Santos*, 228 F. Supp. 3d at 1054 ("Despite having ample opportunity to cure the weaknesses in its evidence, the government has submitted nothing new to support probable cause—that is, it has not presented either additional evidence that [the extraditee] participated in the charged offense or additional evidence that the statements of [the witnesses] were uncoerced (and therefore competent). Its failure to do so is telling." (citing *Strunk*, 293 F. Supp. 2d at 1139-40)); *Strunk*, 293 F. Supp. 2d at 1139 ("While the [requesting country] is not required to submit all their evidence against the extraditee with a request of extradition, the lack of probable cause connecting [the extraditee] to the crime is highlighted by the fact that corroborating evidence

which could have bolstered the case is missing."); *see also United States v. Fraser*, No. 20-00170MJ-001-PHX-MTM, 2021 WL 1968393, at *5 (D. Ariz. May 17, 2021) (declining France's extradition request, and noting with concern that "the Court was not provided with the actual statements; the Court received the French government's representations as to what [the witnesses] told French authorities regarding [the extraditee's] alleged involvement in the importation scheme" and "[t]his evidence is therefore double hearsay: it is a summary by the French authorities of [the witnesses'] statements about [the extraditee's] alleged involvement in the crimes alleged").

The Government addresses the lack of testimony implicating Netzky by arguing that E.J.'s "testimony elsewhere underscores her ability to distinguish occasions when Lesiak and Netzky[] acted together from occasions when they acted independently[,]" providing the example that "she described Lesiak alone as 'smil[ing]' and warning her 'not even to try to think about the fact that [she] might not be able to return the money because there were ways to collect it.'" (Supp. Memo at 4.) Notably, however, the Government cannot point to any example in E.J.'s testimony distinguishing an occasion when Netzky acted independently and unlawfully that she does not also attribute to Lesiak.

There is no dispute that Lesiak engaged in extorting the victim, and he was convicted and served a sentence for doing so. Aside from references to "Lesiak *and* Netzky," E.J.'s testimony supports only a conclusion that Netzky assisted with the initial processing of the loan and called E.J. to remind her to repay the loan—"Netzky[] herself 'reminded [the victim] several times by phone about the amount of money requested, the place where the money was to be transferred, the date and time'" (Supp. Memo at 4)—which is consistent with Netzky's role as Roller's administrative assistant and does not plausibly suggest any involvement in Lesiak's extortion

scheme.[3] The lack of any references by the victim to any individual bad act by Netzky is also corroborated by Lesiak's testimony, as discussed below.

The Court finds that E.J.'s testimony does not support a finding of probable cause because her testimony is conclusory with respect to Netzky's role in the charged offense and does not attribute any specific criminal conduct to Netzky. *See, e.g.*, *Fernandez-Morris*, 99 F. Supp. 2d at 1368 ("Although [the extraditee] may have been the head executive of [the company], that fact alone is insufficient to establish probable cause with respect to the actions taken by his [family members] even if those were shown to be criminal. There is no evidence beyond mere speculation that [the extraditee] had any knowledge of his [family members'] actions[.]"). For these reasons, the prosecutor's selected excerpts of E.J.'s testimony do not support a finding of probable cause here. *See id.* at 1366 (denying extradition request where the Court's review of the alleged victim's affidavit "reveals that it contains a variety of 'conclusory' and speculative statements").

### 2)    M.S. Testimony (The Victim's Husband)

The Government cites to the victim's husband's testimony, but the summary indicates only that he testified that three men visited his wife as part of an effort to extort money from her, and he never mentions Netzky. *See Lehming*, 951 F. Supp. at 516 ("[The evidence] discusses [criminal] activity . . . but fails to personally implicate [the extraditee] as knowing, directing, or participating therein.").

///

---

[3] Netzky submitted competent evidence that it was common during the relevant time period in Poland to install an unwitting person to act as the public face of a company to protect the real owners, that she performed only administrative tasks for Roller at Lesiak's direction, and that patriarchal and chauvinistic norms in Poland at the time prevented women from being directly involved in business dealings. (Netzky Opp'n at 13, 17-18.) As noted, however, the Court need not rely on this evidence in the absence of probable cause.

### 3)       Lesiak Testimony (Netzky's Partner at Roller)

The Government also relies on summaries and excerpts of the testimony of Lesiak, Netzky's partner at Roller who was convicted of the charged extortion offense. Specifically, the Government points to Lesiak's initial, pre-plea testimony that Netzky was involved in issuing the loan to E.J., that he visited E.J. at Netzky's direction, and that he called E.J. to pay back the loan at Netzky's direction. (Memo Law Supp. Extradition at 12.) All of these are lawful activities consistent with Netzky's role as Lesiak's administrative assistant. At the time of this initial testimony, Lesiak denied extorting E.J., but notably, he also denied that Netzky ever threatened E.J. (*Id.*)

After pleading guilty, Lesiak acknowledged and testified in great detail about the extortion scheme, and he never mentioned that Netzky was involved. The Government included Lesiak's plea testimony in its supplemental excerpts: "*I* handed over the money personally to [the victim] in my office[,]" "[the victim] signed a statement that she would pay *me* back[,]" and when she did not pay, "*I* decided to take further steps" and engaged Petryka to enforce the loan. (Supp. Memo, Ex. 2 at 13.) Indeed, the Polish prosecutor acknowledged in the original summary of Lesiak's testimony that Lesiak testified that Netzky "did not commission recovery of the liability[.]" (Memo Law. Supp. Extradition, Ex. 1 at 58.)

The Court finds that Lesiak's testimony attributes only non-criminal acts to Netzky, and that he accepted responsibility for the extortion scheme without inculpating Netzky.[4] Instead of

---

[4] The Polish prosecutor appears to suggest in his supplemental summary of witness testimony that the long-standing business relationship between Netzky and Lesiak was sufficient to implicate her in his extortion, despite scant direct evidence to support that Netzky had any role in the extortion scheme. (*See* Supp. Memo, Ex. 2 at 13) (when asked to address the issue of whether Netzky may have acted under duress, the Polish prosecutor noted that Netzky and Lesiak worked together, the Roller shares were in her name, and the "long-standing relationship between [Netzky] and Marek Lesiak indicates that there was a fundamental understanding between them, covering at least matters connected with running the business").

establishing probable cause, Lesiak's testimony supports Netzky's position that she had no involvement in the charged extortion scheme. *See United States v. Barr*, 619 F. Supp. 1068, 1071-72 (E.D. Pa. 1985) ("A review of the documents submitted leads me to conclude that there is no probable cause to believe [the extraditee] attempted to murder [the victim,]" because "the evidence submitted does not mention or suggest any *act* by [the extraditee]," and "based on the evidence presented, the government has shown only that [the extraditee] was present in the vicinity . . . nothing more" and "[t]hus, I am compelled to deny the government's extradition petition for lack of probable cause."); *see also Mazur*, 2007 WL 2122401, at *26 ("The evidence gives rise to, at most, a soundly-based belief that [the extraditee] was hanging out with some rather shady characters. But that alone is not enough to send him to Poland; on close inspection, the evidence does not give rise to probable cause to believe that he [committed the charged crime]. To the extent the evidence supports the notion that one of these shady characters [committed the charged crime], the evidence would not permit any court to hold [the extraditee] accountable for those actions.").

### 4)    Pietryka Testimony (Crown Witness)

In his testimony on which the Government relies, Pietryka testified that he was not a direct witness to the charged offense. (Memo Law Supp. Extradition at 11, Ex. 1 at 56.) His testimony that he believed Netzky ran the Roller firm and commissioned gang members to collect *other* debts bears no direct relevance to the charged offense. In the supplemental excerpts, the Government points to Pietryka's statement that "[Netzky] . . . made important decisions in financial matters because [Lesiak] abused alcohol." (*Id.* at 3.) Even if that is true, Pietryka said nothing about Netzky's role in the charged extortion scheme.

///

Pietryka's testimony implicates Netzky in non-criminal acts or acts not related to the charged extortion scheme, and does not support a probable cause finding here.[5]

### 5)    Kapuscinski Testimony (Crown Witness/Extorted Money from Victim)

The Government asserted in its original summary that Kapuscinski had identified Netzky as "the leading figure" in the alleged extortion, and that Lesiak was a "person subordinate to [Netzky]." (Memo Law Supp. Extradition at 12, Ex. 1 at 57.) The supplemental evidence the Government provided, which included the actual excerpts from Kapuscinski's testimony, supports a contrary conclusion:

---

[5] In addition, the Polish prosecutor's summary of the evidence does not disclose what benefits Pietryka or Kapuscinski received for their testimony as crown witnesses, and therefore the Court is unable to determine if their testimony as cooperating witnesses is reliable. *See Ben-Dak*, 2008 WL 1307816, at *6 ("As one case considering a request for a certificate of extradition has noted, 'the materials submitted must set forth facts from which both the *reliability of the source* and probable cause can be inferred'" (citing *In Matter of Extradition of Ernst*, No. 97 CRIM.MISC.1 PG.22, 1998 WL 395267, at *9 (S.D.N.Y. July 14, 1998))); *see also Ameen*, 2021 WL 1564520, at *12 ("[T]he court recognizes that the body of case law that cautions against weighing witness credibility in extradition hearings is substantial. The court has adhered to that precedent by excluding numerous documents the defense has submitted for the purpose of undermining witness credibility. But, implicit in the purpose of these probable cause proceedings is the court's ability to reject witness testimony for want of reliability. The court does not determine guilt or innocence, true, but it must assure itself that the standards for probable cause under United States law are satisfied. Thus, there is some tension between the 'accept as true' rule argued by the government and the requirement that the requesting nation present evidence sufficient to satisfy the judicial standards for probable cause under United States law" (citing *Santos*, 830 F.3d at 1006)) (simplified); *Fraser*, 2021 WL 1968393, at *5 ("Both individuals therefore had a strong incentive to 'point the finger' at someone else as the mastermind of the alleged importation scheme. This fact diminishes the credibility of their statements inculpating [the extradite]." (citing *United States v. Vera*, 893 F.3d 689, 693-94 (9th Cir. 2018))); *Mazur*, 2007 WL 2122401, at *23 ("In other words, by his own admission, [the witness] is giving the statement in an attempt to get a reduced sentence in the murder case for which he is being held. This goes beyond questions of credibility; it obliterates the government's only evidence of probable cause. True, [the witness] would not be the first jailed witness to provide testimony against another in the hope of getting a deal for himself. And the existence of a motive to lie does not automatically, by itself, take the evidence out of the probable cause determination. But the key is whether the testimony bears other independent indicia of reliability such that, despite the motive to lie, despite the suspect nature of the testimony, the evidence is otherwise able to support a probable cause finding.") (citation omitted).

PAGE 25 – ORDER DENYING REQUEST FOR EXTRADITION

> Lesiak cooperated with us. There were several meetings with Lesiak regarding
> [E.J.], and they were about the enforcement of the amount granted by Lesiak. It
> was not Lesiak who decided what [E.J.] should do to return the money, but us. . . .
> I directed enforcement against [E.J.] I was commissioned to enforce the money
> from [E.J.] by Lesiak and [Netzky], . . . Lesiak and [Netzky] knew very well that
> they were ordering enforcement against [E.J.] and that they would receive the sum
> of money reduced by 1/3 . . . Lesiak ordered it."

 (Supp. Memo, Ex. 2 at 13.)

    As initial matter, the actual testimony excerpts contradict the Polish prosecutor's

summary of the testimony representing that Kapuscinski believed Netzky was the leading figure

in the extortion. Contrary to the summary, Kapuscinski was clear in his testimony that Lesiak—

not Netzky—was working with the organized criminal group and that "he" ordered the

enforcement of the debt.[6] *See In re Extradition of Molnar*, 202 F. Supp. 2d 782, 787 (N.D. Ill

2002) (finding no probable cause existed in part because the testimony of the witnesses

contradicted the government's summary of the evidence); *In the Matter of Extradition of Ben-

Tov*, No. 05-22201-CIV-GARBER, 2006 WL 8463565, at *9 (S.D. Fla. Feb. 22, 2006)

(reversing decision certifying extradition in light of evidence that the Dominican prosecutor's

summary of witness testimony was misleading when compared to a transcript of the testimony,

and holding that the extraditee has "introduced evidence which casts such serious and substantial

---

    [6] This contradiction further highlights the Court's concern that Poland was unwilling to
provide transcripts of witness testimony, even when the Court put the Government on notice that
the Polish prosecutor's summaries were not sufficient to support a finding of probable cause. *See
Mazur*, 2007 WL 2122401, at *20 ("Before discussing the substance of what [the witness] had to
say, the Court notes a couple of troubling aspects of the statements as submitted by the
government. First, the Court was given abstracts of statements, not the statements themselves.
The Court has no idea what else [the witness] may or may not have said in the various interview
sessions. Second, some of the extracts reflect obvious (though seemingly trifling) errors. . . . The
Court is reluctant to view these errors, as [the extraditee] urges, as evidence of some sinister
motive on the part of the government. But, in any case, the errors do tend to shake the Court's
confidence in the reliability of the records.").

doubt upon the validity of the allegations by the requesting country so as to now obliterate probable cause for the extradition upon the charges advanced by the Dominican Republic").

In any event, like the victim's testimony, Kapuscinski's only reference to Netzky is in tandem with Lesiak, and like Pietryka's testimony, the Government provided select statements of a crown witness without providing sufficient indicia of reliability. *See Mazur*, 2007 WL 2122401, at *27 ("For reasons that remain unclear to this Court, the [requesting country] has pursued extradition based upon selected statements given by [the witness]-a known scoundrel and unmitigated liar-implicating [the extraditee], without addressing all of the other statements given by this witness that, not only do not implicate [extraditee], but contradict what [the witness] said in the statements emphasized by the government. While it is true that the Court may not consider issues relating to the credibility of witnesses whose statements form the basis of the government's extradition request, that prohibition does not require the Court to accept, without question, statements that are riddled with admitted lies and are so inconsistent as to be rendered wholly unreliable. If that were the case, the judicial function in extradition cases would be rendered meaningless and this Court would truly be a rubber stamp for the government.").

### 6)    Wieczorek (Extorted Money from Victim)

Finally, the Government notes that Wieczorek pleaded guilty to extorting money from the victim, but notably does not cite to any testimony from Wieczorek that Netzky was involved. (Memo Law Supp. Extradition at 12-13.)

### 3.    Conclusion

Having reviewed all of the evidence Poland submitted to support a finding of probable cause, the Court finds that the Government has not met its burden of demonstrating probable cause to support Netzky's role in the charged extortion scheme. *See Mazur*, 2007 WL 2122401, at *27 ("This Court is not charged with determining guilt or innocence; nor is this Court

PAGE 27 – ORDER DENYING REQUEST FOR EXTRADITION

permitted to simply hand over a United States citizen on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence.") (citation omitted).

For these reasons, the Court denies the Government's request to certify Netzky's extradition to Poland. *See id.* (denying Poland's extradition request, and stating that "[t]his Court is mindful of the deference to which the decisions of a foreign government are entitled in extradition matters. . . . [b]ut the Court is not merely a rubber stamp for a foreign government's decision that probable cause exists, such that an American citizen should he held to answer criminal charges in that country" because "[i]n our system of justice, each case must be decided based on the particular evidence presented therein" and "in this case, the evidence presented fell short of the mark"); *In re Extradition of Khochinsky*, 116 F. Supp. 3d 412, 422 (S.D.N.Y. 2015) (denying request for extradition to Poland where "the Government has failed to establish probable cause to believe that [the extraditee] committed the crime with which he is charged").[7]

---

[7] *See also Fraser*, 2021 WL 1968393, at *7 (denying extradition request, and finding that when "considering the extradition packet as a whole, in the absence of additional corroborating evidence in this case, certifying extradition would amount to a 'mere ratification of the bare conclusions of others,' a practice expressly prohibited by *Gates*"); *In re Extradition of Lanzani*, No. CV 09-07166-GAF (MLG), 2010 WL 625351, at *9 (C.D. Cal. Feb. 18, 2010) (denying extradition request where "[i]n light of the deficiencies in the materials offered in support of extradition, this Court finds a lack of competent evidence demonstrating that there is reasonable ground to believe [the extraditee] is guilty of the alleged crime"); *Strunk*, 293 F. Supp. 2d at 1140 (finding "the evidence *submitted by the* [*requesting country*] concerning [the extraditee]'s participation in the [charged crime] is so inconsistent and conflicting that it provides little competent evidence to support the conclusion that" the extraditee was involved); *Platko*, 213 F. Supp. 2d at 1237 ("[T]he court declines to certify [the extraditee] for extradition because it finds the evidence offered in support of probable cause lacks legal competency and reliability, as a consequence of which the court cannot on this record make an independent finding of probable cause."); *see also In the Matter of Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1304 (S.D. Fla. 2015) ("Taking into consideration the totality of the circumstances, the Court finds that the evidence presented by the United States on behalf of [the requesting country] does not support a reasonable belief that [the extraditee] is guilty of the crimes charged."); *Ben-Dak*, 2008 WL 1307816, at *16 (denying extradition request based on finding of no probable cause "[w]ith the unsourced, vague and conclusory matters excised from the" government's evidence); *Fernandez-Morris*, 99 F. Supp. 2d at 1369 ("[T]he allegations of the Government are conclusory,

### C.      Pre-Extradition Delay

The Court shares Netzky's concerns that the more than twenty-year delay in charging her with a crime and seeking her extradition violated her rights, and the Court agrees that Netzky was prejudiced by the delay in light of the death or unavailability of almost every key witness involved in this case. However, having found insufficient probable cause to support extradition, the Court need not reach Netzky's argument that the delay violated her constitutional rights. Accordingly, the Court denies as moot Netzky's motion to compel further discovery in support of her due process argument.[8]

## CONCLUSION

For the reasons stated, the Court declines to certify the extradition of Ana Netzky to Poland, denies as moot her second motion to compel further discovery (ECF No. 52), and dismisses this case.

DATED this 28th day of June, 2022.

*Stacie F. Beckerman*
_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

unsupported by the evidence, and contain no evidence to suggest to the Court that [the extraditee] had the requisite criminal intent with respect to the crimes at issue. . . . Accordingly, the Court finds no probable cause, and thus extradition will be denied[.]"); *In re Extradition of Okeke*, No. 96-7019P-01, 1996 WL 622213, at *6 (D.N.J. Sept. 5, 1996) ("While the Court does find that there is some evidence, . . . to support probable cause, [other evidence] renders this evidence unpersuasive in the absence of any corroboration. Consequently, the Court finds that the Government has failed to establish the element of probable cause necessary for extradition and further finds that [the fugitive] is not subject to extradition to the [requesting country] pursuant to 18 U.S.C. § 3184 and the 1909 Extradition Treaty between the United States and [the requesting country].").

[8] The Court also denies as moot the Government's oral motion at the extradition hearing to exclude evidence submitted by Netzky from journalist Janusz Szostak (*see* Netzky Opp'n at 16-20), because the Court did not rely on that evidence herein.

PAGE 29 – ORDER DENYING REQUEST FOR EXTRADITION